## Case No. 1,289.

### The BEN ADAMS.

[2 Ben. 445.] [1]

District Court, S. D. New York. June Term, 1868.

SHIPPING—BILL OF LADING—DELIVERY—MARKS AND NUMBERS.

Where flour was shipped on board of a vessel at New Orleans, bound for New York, by two different shippers, the flour being all branded,

---

[1] [Reported by Hon. William Cranch, Chief Judge.]

[2] [Reversed by supreme court, in Scott v. Ben, 6 Cranch, (10 U. S.) 3.]

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

"Nonpareil Mills," but the two different lots having also other brands by which they were easily distinguishable, and, for one lot of 1,000 barrels, being of a better quality and a higher value than the other, which was shipped first, a bill of lading was given, in which the flour was stated to be "marked and numbered as in the margin," the entry in the margin being simply "1,000 bbls. 'Nonpareil Mills,'" and on the arrival of the ship at New York, only 439 barrels of the 1,000 were delivered to the consignee, but, all the flour marked "Nonpareil Mills" having been discharged on the dock, a portion of the 1,000 barrels is taken away by the consignee of the other lot of flour, who was allowed to take it by the delivery clerk having charge of the delivery of the cargo: *Held*, that the consignee of the 1,000 barrels was entitled to a delivery of the identical barrels shipped, and was entitled to a decree against the ship for the damages occasioned by the nondelivery to him of the whole number of barrels shipped to him, less the freight and primage.

[Cited in The Santee, Case No. 12,328.]

In admiralty.

Beebe, Dean & Donohue, for libellants.

T. C. T. Buckley and J. K. Hill, for claimants.

BLATCHFORD, District Judge. This is a libel filed by Partridge, Wells & Co., of New York, against the ship Ben Adams, to recover $7,012.50, as the value of 561 barrels of flour, shipped by the Ben Adams, at New Orleans, on the 13th of March, 1865, by T. Prudhomme, consigned to the libellants at New York, under a bill of lading signed by the master of the ship therefor. The bill of lading was for "one thousand barrels of flour, being marked and numbered as in the margin." The entry in the margin was "1,000 bbls. 'Nonpareil Mills.'" The one thousand barrels were, all of them, when put on board of the ship, branded as follows, on one of the heads of each barrel: An outer circle of scroll-work; next within, in a circular form, occupying about two-thirds of the upper part of the circle, with the concave part downwards, the words, "Nonpareil Mills," the remaining one-third, or lower part, of the same circle, being filled up, with the concave part upward, with the words, "St. Louis, Mo.;" next within, a circle of scroll-work; within that circle, the words and figures, "196, choice extra, John F. Tolle." There were, on board of the same ship, on the same voyage, 596 other barrels of flour, all of them, when put on board, branded as follows, on one of the heads of each barrel: An outer circle of scroll-work; next within, in a circular form, occupying one-half of the upper part of the circle, with the concave part downward, the words, "Nonpareil Mills," the remaining one-half, or lower part, of the same circle, being filled up, with the concave part upward, with the words, "A. S. Browning & Co.;" within that circle the words and figures, "196, choice extra." These 596 barrels were of a quality much inferior to the flour shipped by Prudhomme, and were worth considerably less per barrel in the market. They were put on board the vessel on the 4th of March, 1865—that is, nine days before the Prudhomme flour was put on board—and were shipped by Given, Watts & Co., of New Orleans, to Watts, Crane & Co., of New York, under a bill of lading which specified the mark on them as being "Nonpareil." The allegation of the libel is, that the ship arrived at New York, with the 1,000 barrels of the Prudhomme flour, but that only 439 barrels of it were delivered to the libellants. Besides the 1,000 barrels and the 596 barrels, there were on board of the vessel 4,690 other barrels of flour, of various brands, but none of them branded "Nonpareil."

The defence set up in the answer is, that, on the arrival of the ship at New York, notice of her arrival, and of the place of discharge of her cargo, was given to the libellants; that, in accordance with the usage of the port, the flour was discharged from the ship on pier 19, East river, and was thenceforth at the risk of the libellants, who thereupon undertook to remove it; that thereby the bill of lading was discharged; that the ship had on board the 596 barrels, branded "Nonpareil Mills," consigned to Watts, Crane & Co.; that, previous to the 29th of April, 1865, there had been discharged from the ship, and placed on the wharf, 978 barrels of flour, branded "Nonpareil Mills;" that, of this number, the libellants carted away 439 barrels, and suffered and allowed Watts, Crane & Co. to cart away 539 barrels; and that such flour was taken by the consignees respectively, after it had been landed on the dock, and without any notice to the vessel that there was any difference in the two parcels, in quality or brand, and without any actual knowledge on the part of the master or owners of any such difference. The answer closes with an averment that the claimants have always been ready and willing to deliver to the libellants, "on payment of freight, the remaining 561 barrels of flour shipped at New Orleans, branded 'Nonpareil Mills.'"

This answer sets up grounds of defence that are inconsistent with each other. It sets up that the bill of lading for the 1,000 barrels was discharged by the unlading of them on the wharf, and that the libellants negligently allowed Watts, Crane & Co. to cart away 539 barrels, branded "Nonpareil Mills;" and it also sets up a willingness to deliver to the libellants 561 barrels of flour, which are not the barrels shipped by Prudhomme. If the 561 barrels were delivered so as to discharge the bill of lading, or if, as to the 539 barrels, it was the negligence of the libellants which allowed Watts, Crane & Co. to take them, then the ship is not responsible in respect of what was so delivered, or so lost through the negligence of the libellants. But if the ship is responsible for the 561 barrels, then the libellants are entitled to the identical 561 barrels shipped by Prudhomme, or their value, and the contract of affreightment cannot be discharged by turn-

ing over to the libellants 561 barrels of the other and inferior flour consigned to Watts, Crane & Co.

The ship was bound to discriminate between the two parcels of flour, marked "Nonpareil," and to see that each consignee received the proper flour. The 596 barrels shipped to Watts, Crane & Co. were taken on board and stowed, on the evidence, several days before any of the Prudhomme flour was put on board. The latter flour was nearer the top of the cargo, and came out before the other. It does not appear that the shipper of the Prudhomme flour knew, or had notice, that there was any other flour on board of the ship, marked "Nonpareil." It was the business of the ship to know that, and to see that a proper discrimination was made in the Prudhomme bill of lading, and on the ship's manifest, and on the cargo book of the ship, between the "Nonpareil" flour of Prudhomme, and the other "Nonpareil" flour previously put on board. Prudhomme was not called upon, on the facts in this case, to exercise any caution on that subject. The barrels he offered for shipment had marks on them sufficient to show to those in charge of the vessel that there was a likelihood that, without proper care, such barrels might be mistaken for those previously shipped by Given, Watts & Co., and also to show that, with proper care, their identification could be easily secured. Those in charge of the ship chose to throw away all precautions, and to enter on the bills of lading and on the manifest, in regard to both parcels, simply the word, "Nonpareil;" and the conduct of those charged by the claimants with the delivery of the flour at New York, and the language of the answer in the case, serve to show that the obligation of the vessel to both of the consignees is supposed to be discharged by delivering to each the proper number of barrels branded "Nonpareil," whether they are, or not, the identical barrels for which the bills of lading were respectively given. Such was not the obligation of the ship. The libellants are entitled to the identical 561 barrels shipped by Prudhomme, or their value.

The bill of lading in this case has not been discharged by the ship. It is, undoubtedly, the law, that delivery on the wharf, in the case of goods transported by a vessel, is sufficient, if due notice be given to the consignees, and the different consignments be properly separated, so as to be open to inspection by their respective owners. But, where they are delivered on the wharf, there must, in addition to due and reasonable notice to the consignee, be a fair opportunity afforded to him to remove his goods. The Eddy, 5 Wall. [72 U. S.] 481, 495. And the carrier is responsible for the value of the goods, if he delivers them to the wrong person, even though by mistake or imposition. Story, Bailm. § 545b; The Huntress, [Case No. 6,914.] The due and proper separation and designation of the goods by the carrier, for the use of the consignee, is insisted on by all the authorities, as an indispensable prerequisite, in addition to notice to the consignee of the time and place of delivery, to relieve the carrier from responsibility. 3 Kent, Comm. 215; The Eddy, above cited.

In the present case, the ship assumed the obligation of delivering the flour to the proper parties, and undertook to discharge it by employing a clerk, who was stationed on the wharf, and whose business it was to receive orders for the flour, addressed to the ship, and to fill them. Not a barrel of flour was allowed by this clerk to be taken from the wharf, unless a written order for it, addressed to the ship, was presented to and left with him. On the 18th of April, Watts, Crane & Co. gave a written order to the ship to deliver 596 barrels, branded "Nonpareil." On that order, the clerk delivered 539 barrels of the 1,000 barrels shipped by Prudhomme. Watts, Crane & Co. received those 539 barrels, and the libellants did not receive any of them. Before any flour was delivered from the ship, due notice was given to the libellants of the arrival of the vessel at New York, and that she had on board merchandise for them, and that she was discharging at pier 19, East river. But, as the libellants' flour came out, it was not properly separated, so as to be open to inspection by them, nor was a fair opportunity afforded to them to remove it, nor was it designated for their use by the clerk; but, on the contrary, the clerk designated the 539 barrels for the use of Watts, Crane & Co., and wrongfully delivered it to them, and gave the libellants no opportunity to take it. The cartmen of the libellants took no flour, except 439 barrels of the identical flour that had been shipped by Prudhomme. They would have taken the 539 barrels which the cartmen of Watts, Crane & Co. took, but the clerk designated those barrels for the use of Watts, Crane & Co., and delivered it to them on an order given by them to the ship for 596 barrels, branded "Nonpareil." The clerk took receipts from Watts, Crane & Co. for the 539 barrels on such delivery. The evidence clearly shows that the clerk made no discrimination among the barrels, branded, "Nonpareil," but inasmuch as he found on the manifest of the ship 1,596 barrels, marked "Nonpareil," considered that any order for "Nonpareil" flour, whether given by the libellants, or by Watts, Crane & Co., could be properly filled by the delivery of any barrels that were branded "Nonpareil." His attention was called, while delivering the Prudhomme flour on the order of Watts, Crane & Co., to the fact that he was delivering the wrong flour, but he paid no attention to the caution. There is no foundation for the allegation in the answer, that the libellants negligently allowed Watts, Crane & Co. to cart away the 539 barrels.

It is claimed that the clerk was not the

agent of the ship, but merely of the consignees of the ship, and that the responsibility of the ship in rem ceased after due previous notice to the consignees of the time and place of the unlading of the cargo, the moment the flour was landed over the ship's side upon the dock. This is not so, on the facts of this case. The clerk, as agent of the ship, retained the custody and control of the flour, as and after it reached the wharf, and undertook to deliver it therefrom on orders, not permitting the consignees to interfere with it, except with his consent. The case does not fall within the class of cases where the consignee undertakes to remove the goods from the wharf after they are discharged from the ship, and after the responsibility of the ship in regard to them has ceased. It differs from the case of Field v. The Lovett Peacock, decided by this court in April, 1863, [Case No. 4,768,] and from cases of that character, in the fact that, in the present case, no opportunity was afforded by the ship to the libellants to take possession of, and remove, the 561 barrels shipped by Prudhomme; and the 539 barrels of that flour which were taken by Watts, Crane & Co. remained in the charge, custody, and control of the vessel, until the clerk wrongfully delivered them to Watts, Crane & Co.

The libellants are entitled to a decree for the damages sustained by them by the non-delivery of the 561 barrels of flour shipped by Prudhomme, deducting therefrom the freight, primage, and average specified in the bill of lading for the carriage of the 1,000 barrels, and there must be a reference to a commissioner to ascertain and report the amount for which the decree is to be entered on that basis.